**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FEDERAL TRADE COMMISSION,

         Plaintiff,

         v.

ENDO PHARMACEUTICALS INC., et al.,

         Defendants.

Case No.: 1:21-cv-217-RCL

REDACTED PUBLIC VERSION

**Plaintiff Federal Trade Commission's Opposition to Specially Appearing Defendant Endo International plc's Motion to Dismiss Complaint for Lack of Personal Jurisdiction or for Failure to State a Claim (Dkt. No. 53)**

## Table of Contents

INTRODUCTION ............................................................................................................ 1

BACKGROUND .......................................................................................................... 2

    A.    Endo International remains a U.S. business, notwithstanding its Irish
           domicile.......................................................................................................... 2

    B.    Endo International is responsible for decisions about the sale of
           oxymorphone ER in the United States...................................................... 4

ARGUMENT ................................................................................................................ 6

I.    The Court can exercise general jurisdiction over Endo International because of its
      substantial contacts with the United States........................................................ 7

II.    The Court can exercise specific jurisdiction over Endo International because of its
      conduct related to the claims in this case ........................................................ 11

    A.    Endo International orchestrated its subsidiaries' actions and approved the
           2017 Agreement............................................................................................ 12

    B.    Exercising specific jurisdiction over Endo International satisfies
           traditional notions of fair play and substantial justice ........................... 15

III.    The Court has jurisdiction over Endo International because it is the alter ego of
       Defendant Endo Pharmaceuticals ..................................................................... 17

    A.    Endo International actively and substantially controls Endo
           Pharmaceuticals .......................................................................................... 17

    B.    Fairness supports a finding of alter ego ................................................... 20

IV.    The Complaint states a claim against Endo International................................. 21

CONCLUSION............................................................................................................ 22

## Table of Authorities

<u>**Cases**</u>

*Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*, 480 U.S. 102 (1987)................... 15

*Atwal v. Lawrence Livermore Nat'l Sec.*, LLC, 786 F. Supp. 2d 323 (D.D.C. 2011) ................... 8

*Bigelow v. Garrett*, 299 F. Supp. 3d 34 (D.D.C. 2018) ........................................................... 6, 11

*Brit UW, Ltd. v. Manhattan Beachwear, LLC*, 235 F. Supp. 3d 48 (D.D.C. 2017)...................... 8

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)............................................................... 15

*Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101 (4th Cir. 2011) ............ 8

*\*City & Cnty. of S.F. v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610 (N.D. Cal. 2020) .......... 17, 19

*Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158 (D.D.C. 2018).............. 11

*\*CostCommand, LLC v. WH Administrators, Inc.*, 820 F.3d 19 (D.C. Cir. 2016)........................ 8

*\*Daimler AG v. Bauman*, 571 U.S. 117 (2014) .............................................................. 7, 8, 9, 11

*Dee-K Enters., Inc. v. Heveafil Sdn. Bhd.*, 982 F. Supp. 1138 (E.D. Va. 1997).......................... 16

*Empson & Co., S.R.L. v. Mar-Salle Imports, Ltd.*, No. Civ. A. 86-1944, 1987 WL 12793
     (D.D.C. June 12, 1987)....................................................................................................... 18

*\*Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883 (D.C. Cir. 2021)........................................ 7, 8

*FTC v. Mylan Labs., Inc.,* 62 F. Supp. 2d 25 (D.D.C. 1999)....................................................... 22

*FTC. v. Mallett*, 818 F. Supp. 2d 142 (D.D.C. 2011) ................................................................... 6

*\*Hertz Corp. v. Friend*, 559 U.S. 77 (2010) ............................................................................... 8

*\*IMark Mktg. Servs., LLC v. Geoplast S.p.A.*, 753 F. Supp. 2d 141 (D.D.C. 2010) ........ 17, 18, 19

*Impax Labs. Inc. v. FTC*, 994 F.3d 484 (5th Cir. 2021) ......................................................... 5, 21

*In re Vitamins Antitrust Litig.*, 270 F. Supp. 2d 15 (D.D.C. 2003)............................................. 16

*Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310
     (1945)........................................................................................................................ 6, 11, 15

*Johnson v. SmithKline Beecham Corp.*, 853 F. Supp. 2d 487 (E.D. Pa. 2012) ........................... 10

*Johnson-Howard v. AECOM Special Missions Servs., Inc.*, 434 F. Supp. 3d 359 (D. Md.
     2020)..................................................................................................................................... 8

*Johnson-Tanner v. First Cash Fin. Servs., Inc.*, 239 F. Supp. 2d 34 (D.D.C. 2003)........ 18, 19, 21

*Labadie Coal Co. v. Black*, 672 F.2d 92 (D.C. Cir. 1982)....................................................... 18, 20

*Livnat v. Palestinian Auth.*, 851 F.3d 45 (D.C. Cir. 2017) ............................................................ 6

*\*Material Supply Int'l v. Sunmatch Indus. Co. Ltd.*, 62 F. Supp. 2d 13 (D.D.C. 1999)......... 17, 20

*Mwani v. bin Laden*, 417 F.3d 1 (D.C. Cir. 2005) ................................................................... 6, 15

*Nespresso USA, Inc. v. Ethical Coffee Co.*, 263 F. Supp. 3d 498 (D. Del. 2017) ......................... 8

*\*Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952) .................................................... 8

*Se. Pa. Transp. Auth. v. AbbVie Inc.*, C.A. No. 10374–VCG, C.A. No. 10408–VCG, 2015
     WL 1753033 (Del. Ch. Apr. 15, 2015).................................................................................. 2

*U.S. v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)............................................................... 21

*Vasquez v. Whole Foods Mkt., Inc.*, 302 F. Supp. 3d 36 (D.D.C. 2018) ..................................... 11

**Statutes**

15 U.S.C. § 53(b) .......................................................................................................................... 6

**Rules**

Fed. R. Civ. P. 4(k)(1)(C) ............................................................................................................. 6

## INTRODUCTION

This case is about an unlawful agreement to restrain competition in the U.S. market for the brand-name drug Opana ER and its generic equivalent, oxymorphone ER. Defendant Endo International plc ("Endo International") argues that this Court cannot exercise personal jurisdiction over it because there is a "complete absence of a connection between Endo International and any of the allegedly anticompetitive conduct challenged in the Complaint, or the United States generally." Dkt. No. 53-1 at 2.[1] Endo International's argument is meritless.

First, the Court can exercise general jurisdiction over Endo International because, as to "the United States generally," Endo International maintains its principal place of business at a U.S. headquarters in Pennsylvania, where its President and CEO and other officers manage the company. In the alternative, Endo International's other contacts with the United States are so substantial and of such a nature as to render it "at home" in the United States.

Second, the Court can exercise specific jurisdiction over Endo International because of its conduct unlawfully restraining trade in the U.S. market for oxymorphone ER. It withdrew Opana ER from the U.S. market. It coordinated the plan to terminate Par's product in favor of sharing Defendant Impax Laboratories' oxymorphone ER profits. And, the unlawful agreement itself includes representations about Endo International's role in the oxymorphone ER marketplace.

Third, the Court has jurisdiction over Endo International as the alter ego of Endo Pharmaceuticals. Endo International substantially and actively controls Endo Pharmaceuticals. The Northern District of California recently permitted litigation against Endo International to

---

[1] Memorandum of Points and Authorities in Support of Specially Appearing Defendant Endo International plc's Motion to Dismiss Complaint for Lack of Personal Jurisdiction or, in the Alternative, for Failure to State a Claim Upon Which Relief Can Be Granted ("Endo Int'l Mem.").

proceed on the theory that it is the alter ego of its U.S. subsidiaries, including Endo Pharmaceuticals.

Finally, Endo International's motion to dismiss for failure to state a claim should be denied because it ignores the well-pleaded allegations of the Complaint and improperly relies on extrinsic materials.

## BACKGROUND

### A.   Endo International remains a U.S. business, notwithstanding its Irish domicile

In 2014, U.S. company Endo Health Solutions, Inc. underwent a corporate inversion into a new, Ireland-registered entity called Endo International. *See* Weingarten Ex. A (Endo Int'l Dec. 2013 S-4) at 3, 22.[2] "A corporate inversion is a corporate reorganization in which a company changes its country of residence by resituating its parent element in a foreign country."[3] Despite incorporating in Ireland, Endo International did not "expect[] to have substantial business activities" there. Weingarten Ex. A (Endo Int'l Dec. 2013 S-4) at 21. Endo International's stock was then—and is now—listed on the Nasdaq stock exchange. *See id.* at 14; Weingarten Ex. G (Endo Int'l 2020 10-K) at 4. All of Endo Health Solutions' shareholders became Endo International shareholders. *See* Weingarten Ex. A (Endo Int'l Dec. 2013 S-4) at 3, 21. The new structure made Endo International the ultimate parent company of Endo Health Solutions (*see id.*), which in turn wholly owns Defendant Endo Pharmaceuticals Inc. and other entities, including Par Pharmaceutical, *see* Weingarten Ex. G (Endo Int'l 2020 10-K) at 28-29.

---

[2] All citations to "Weingarten Ex." are to the numbered exhibits attached to the accompanying Declaration of James H. Weingarten, filed simultaneously with this motion.

[3] *Se. Pa. Transp. Auth. v. AbbVie Inc.*, C.A. No. 10374–VCG, C.A. No. 10408–VCG, 2015 WL 1753033, at *2 (Del. Ch. Apr. 15, 2015).

Endo International is managed day-to-day from its U.S. headquarters in Malvern, Pennsylvania, the same location as the headquarters of Endo Health Solutions before and after the inversion. Compl. ¶ 14; Weingarten Ex. B (Endo 2012 10-K) at 5 (listing Endo Health Solution's principal executive offices in 2012 at 1400 Atwater Drive, Malvern, Pennsylvania). Endo International's current CEO and president, chief financial officer, chief legal officer and company secretary, and global commercial operations officer work in Malvern. Weingarten Ex. C (Coleman Exec. Employ. Agmt. (2020)) at 3 (CEO and president); Weingarten Ex. D (Bradley Exec. Employ. Agmt. (2020)) at 3 (CFO); Weingarten Ex. E (Maletta Exec. Employ. Agmt. (2020)) at 1 (CLO and secretary); Weingarten Ex. F (Barry Exec. Employ. Agmt. (2020)) at 3 (GCO).[4] These Endo International executives travel to other company offices, including Ireland, only when "reasonably necessary and appropriate." *Id.* Nine of the ten directors on Endo International's Board are based in the United States. Weingarten Ex. H (Endo Int'l 2021 Shareholder Mtg. Notice) at 13. And the U.S.-based non-employee directors are entitled to a stipend for travel to Ireland for Endo International business. *Id.* at 10.

Endo International's revenues and operations are focused in the United States. Approximately ninety-seven percent of Endo International's revenue is from sales to U.S. customers. Weingarten Ex. G (Endo Int'l 2020 10-K) at 11. Endo International's research and development team and its regulatory affairs staff is based primarily in Pennsylvania and India. *Id.* at 6. Its only manufacturing sites are in the United States and India. *Id.* at 5. Operations of the

---

[4] Endo International filed the employment agreements, which are attached to this filing as Exhibits C, D, E, and F, with the U.S. Securities Exchange Commission as exhibits to its 2020 10-K filing, which is attached to this filing as Exhibit G. The agreements are between the individual executives and Endo Health Solutions and identify the role of each executive at Endo International. In addition, Exhibit G lists these individuals as Endo International's executive officers at page 8 and provides hyperlinks to the employment agreements at pages 22-23.

company's four reportable segments are in the United States, India, and Canada, with the vast majority in the United States; only the company's global quality and supply chain functions run from Ireland. *Id.* at 14.

> **B.   Endo International is responsible for decisions about the sale of oxymorphone ER in the United States**

Opana ER, a brand name oxymorphone ER, was introduced in 2006. Compl. ¶¶ 19-20. Opana ER became an extremely important product for Endo International, accounting for 14% of brand drug revenues in 2016. *Id.* ¶ 71. But in 2017, the U.S. Food and Drug Administration identified safety concerns with Opana ER—namely, the possibility for abuse—and requested that Endo International withdraw the product from the market. *Id.* ¶¶ 65-69.

In July 2017, Endo International issued a press release providing an update on Opana ER in the U.S. market. *Id.* ¶¶ 69-70; Weingarten Ex. I (*Endo Provides Update On OPANA® ER*, Endo (July 6, 2017)). In this release, Endo International asserted its continued belief in "the safety, efficacy, and favorable benefit-risk profile of OPANA ER." Weingarten Ex. I (*Endo Provides Update On OPANA® ER*, Endo (July 6, 2017)). It also touted its "significant steps . . . to combat misuse and abuse" of Opana ER. *Id.* Nevertheless, in light of FDA's concerns, Endo International "decided to voluntarily remove Opana ER from the [U.S.] market." *Id.*

Even before the FDA requested removal of Opana ER from the market, Endo International developed a strategy and took concrete steps to launch a generic oxymorphone ER product in the United States. *See* Compl. ¶¶ 73-82. Endo International's subsidiary Par Pharmaceutical owned the rights to an FDA-approved application for a generic oxymorphone ER product. *Id.* ¶ 75. Endo International formed a management committee, including Endo International executives, to relaunch an oxymorphone ER product. *Id.* ¶ 76. Endo International's

CEO approved the use of funds to make Par facilities ready to manufacture a new oxymorphone ER product. Compl. ¶ 81.

In August 2017, Paul Campanelli, President and CEO of both Endo International and Endo Pharmaceuticals, executed the agreement with Defendant Impax to unlawfully restrain trade in the U.S. market for oxymorphone ER (the "2017 Agreement"). *See* Compl. ¶ 92, 120; *see also* Campanelli Decl. ¶¶ 2-4. Endo Pharmaceuticals had been litigating a breach of contract dispute against Impax regarding their 2010 settlement and license agreement.[5] Compl. ¶¶ 17-31. To settle that dispute, Impax agreed to pay Endo Pharmaceuticals ███ % of its gross profits from selling oxymorphone ER in the United States. *Id*. ¶ 94. Those payments end if, *inter alia*, Endo Pharmaceuticals, Endo International, or any of its affiliates enters the oxymorphone ER market. *See* Compl. ¶¶ 92-95.

██████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████; *see* Compl. ¶ 91. Executing the 2017 Agreement secured the payments from Impax and eliminated Endo International as a potential competitor in the oxymorphone ER market. Compl. ¶¶ 100, 102. This is because Endo International could expect to earn more money staying out of the oxymorphone ER market and splitting Impax's oxymorphone ER monopoly profits via Endo Pharmaceuticals than Endo International would earn from Par reentering the market and competing with Impax. *Id*. ¶¶ 103-05.

---

[5] The Fifth Circuit recently affirmed the FTC's ruling that the 2010 settlement agreement was itself an unlawful restraint of trade in the U.S. market for oxymorphone ER. *Impax Labs. Inc. v. FTC*, 994 F.3d 484, 500 (5th Cir. 2021).

**ARGUMENT**

To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff is required to make a "prima facie showing" that jurisdiction exists. *Livnat v. Palestinian Auth.*, 851 F.3d 45, 56-57 (D.C. Cir. 2017). "[P]laintiffs are not limited to evidence that meets the standards of admissibility required by the district court. Rather, they may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005). Although the court need not accept a plaintiff's allegations as true, "[a]ll factual discrepancies . . . must be resolved in the plaintiff's favor." *Bigelow v. Garrett*, 299 F. Supp. 3d 34, 41 (D.D.C. 2018) (citing *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990)).

Endo International's challenge to personal jurisdiction rests solely on whether it has the requisite "minimum contacts" with the forum to satisfy the Due Process Clause.[6] *See generally Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945). In this case, as Endo International concedes (Endo Int'l Mem. 1 n.1), the relevant minimum contacts are with the United States because the FTC served Endo International pursuant to a statute authorizing nationwide service of process. *See* 15 U.S.C. § 53(b); *see also FTC. v. Mallett*, 818 F. Supp. 2d 142, 147 (D.D.C. 2011) (quoting *SEC v. Bilzerian*, 378 F.3d 1100, 1106 n.8 (D.C. Cir. 2004)) ("'[T]he requirement of "minimum contacts" with a forum state is inapplicable' and instead 'minimum contacts with the United States suffice.'").

The Court should deny Endo International's motion to dismiss for lack of personal jurisdiction for three alternative reasons. First, Endo International is subject to the general

---

[6] Endo International does not contest that there was a proper summons and has waived service. *See* Fed. R. Civ. P. 4(k)(1)(C) ("Serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant . . . when authorized by a federal statute.").

jurisdiction of this Court because its principal place of business, i.e., its corporate "nerve center," is in the United States, or, alternatively, because Endo International's contacts with the United States are so substantial that it is "at home" here. Second, Endo International is subject to the specific jurisdiction of this Court given its extensive conduct related to oxymorphone ER and the 2017 Agreement's unlawful restraint of trade in that market. Third, Endo International is the alter ego of its subsidiary Defendant Endo Pharmaceuticals, over which the Court indisputably can exercise jurisdiction.

Separately, Endo International's alternative motion to dismiss for failure to state a claim (*see* Endo Int'l Mem. 16-18) should be denied because it ignores the well-pleaded allegations of the Complaint and improperly relies on extrinsic materials. The FTC also incorporates by reference its arguments in its brief opposing Defendants Endo Pharmaceuticals' and Impax Laboratories' motions to dismiss.

## I.     The Court can exercise general jurisdiction over Endo International because of its substantial contacts with the United States

General jurisdiction "permits a court to assert jurisdiction over a defendant based on a forum connection unrelated to the underlying suit." *Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883, 889 (D.C. Cir. 2021) (citation omitted). Endo International is subject to general jurisdiction in this Court for two alternative reasons. First, its corporate "nerve center"—its principal place of business—is in the United States. Second, Endo International's contacts with the United States are so substantial that it is essentially at home in the United States.

The "paradigm" forums that can exercise general jurisdiction over a corporation are the corporation's place of incorporation and its principal place of business. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). "[A] corporation's principal place of business is its 'nerve center,' *i.e.*, "the place where the corporation's high-level officers direct, control, and coordinate the

corporation's activities." *CostCommand, LLC v. WH Administrators, Inc.*, 820 F.3d 19, 21 (D.C. Cir. 2016) (quoting *Hertz Corp. v. Friend*, 559 U.S. 77, 80-81 (2010)).[7] A corporation may have only one nerve center. *See Hertz*, 559 U.S. at 93. That nerve center is "not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion)" *Id.*. The nerve center is instead where corporate executives exercise "control over the company." *CostCommand*, 820 F.3d at 23-24. For example, in *Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 107 (4th Cir. 2011), the corporate nerve center was the city "where nearly all of the high-level officers work, make significant corporate decisions, and set corporate policy."

Separately, the Supreme Court has recognized that general personal jurisdiction also exists when a corporation's contacts with the forum are "so substantial and of such a nature" as to render it at home there. *See Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 418, 446-47 (1952); *Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883, 889-90 (D.C. Cir. 2021).[8] As the Supreme Court explained in *Daimler AG v. Bauman*, *Perkins* "remains the textbook case of

---

[7] Although *Hertz* and *CostCommand* applied the "nerve center" test to determine a company's principal place of business in the context of subject-matter jurisdiction, courts regularly apply that test when assessing personal jurisdiction. *See, e.g.*, *Johnson-Howard v. AECOM Special Missions Servs., Inc.*, 434 F. Supp. 3d 359, 367-70 (D. Md. 2020) (using "nerve center" test to determine "principal place of business" for both subject-matter and personal jurisdiction); *Nespresso USA, Inc. v. Ethical Coffee Co.*, 263 F. Supp. 3d 498, 503 (D. Del. 2017) ("Because Nestlé's and Nestec's nerve centers are in Switzerland . . . they cannot be subject to general jurisdiction here."); *Atwal v. Lawrence Livermore Nat'l Sec.*, LLC, 786 F. Supp. 2d 323, 327 (D.D.C. 2011) (citing *Hertz* as an example of what a plaintiff might show to prove personal jurisdiction).

[8] This standard for whether a corporation is "essentially at home"—which asks where a nonresident business's decision makers work and run the corporation's operations—is distinct from an inquiry into "stream of commerce"—which asks where a nonresident business's products are sold and marketed. *Brit UW, Ltd. v. Manhattan Beachwear, LLC*, 235 F. Supp. 3d 48, 60 (D.D.C. 2017).

general jurisdiction appropriately exercised over a foreign corporation that has not consented to suit in the forum." 571 U.S. 117, 129 (2014) (quotation marks omitted). As *Daimler* explained:

> The defendant in *Perkins*, Benguet, was a company incorporated under the laws of the Philippines, where it operated gold and silver mines. Benguet ceased its mining operations during the Japanese occupation of the Philippines in World War II; its president moved to Ohio, where he kept an office, maintained the company's files, and oversaw the company's activities. The plaintiff, an Ohio resident, sued Benguet on a claim that neither arose in Ohio nor related to the corporation's activities in that State. We held that the Ohio courts could exercise general jurisdiction over Benguet without offending due process.

*Daimler*, 571 U.S. 129-30 (quotation marks and citations omitted). Notwithstanding that Benguet was incorporated and operated in a foreign country, Ohio could exercise general jurisdiction over Benguet because the company's contacts were so substantial that it was essentially at home there.

Applying these principles, this Court can exercise general jurisdiction over Endo International because its "nerve center" is in the United States. Endo International's U.S. headquarters is in Malvern, Pennsylvania. Compl. ¶ 14. The company's accounting records are kept at that office. Weingarten Ex. J (Endo Int'l Directors' Report (Dec. 31, 2020)) at 5. Endo International's CEO and president works there. Compl. ¶ 14; Weingarten Ex. C (Coleman Exec. Employ. Agmt. (2020)) at 3 (CEO and president). The company's chief financial officer, global commercial operations officer, and chief legal officer (who also serves as company secretary) "primarily provide services at the Company's U.S. headquarters in Malvern, Pennsylvania." Weingarten Ex. D (Bradley Exec. Employ. Agmt. (2020)) at 3 (CFO); Weingarten Ex. F (Barry Exec. Employ. Agmt. (2020)) at 3 (GCO); Weingarten Ex. E (Maletta Exec. Employ. Agmt. (2020)) at 1 (CLO and secretary). These executives travel to Ireland only as "necessary."

Weingarten Ex. F (Barry Exec. Employ. Agmt. 2020)) at 3 (GCO); Weingarten Ex. E (Maletta Exec. Employ. Agmt. (2020)) at 1 (CLO)).[9]

In the alternative, Endo International's contacts with the United States are so substantial that it is "at home" in the United States. Endo International's operations before and after the inversion are largely in the United States. Endo International describes the Pennsylvania office that houses both Endo International's U.S. headquarters and Endo Pharmaceuticals as its "most significant" leased property. Weingarten Ex. G (Endo Int'l 2020 10-K) at 26. Its only manufacturing centers are in the United States and India—not Ireland. *Id.* at 5. Its "R&D and regulatory affairs staff is based primarily in India and Pennsylvania." *Id.* at 6. The operations of the company's four reportable segments are in the United States, India, and Canada, with the vast majority in the United States. *Id.* at 14. Endo International's stock is listed on the Nasdaq, a U.S. stock exchange. *Id.* at 4. Approximately 97% of Endo International's revenues are from U.S. customers. *Id.* at 11.

Endo International's attempts to minimize its contacts with the United States fail. Endo International relies on (1) its assertion that it has "no employees in the United States," (Endo Int'l Mem. 14; *see also* Voss Decl. ¶ 6); (2) a conclusory statement from Endo International's Assistant Secretary that Ireland is Endo International's principal place of business (Endo Int'l Mem. 14; Voss Decl. ¶ 3); and (3) the surprising assertion that "Endo International plc does not maintain headquarters in the United States," (Voss Decl. ¶ 6), despite numerous public statements to the contrary. None of these assertions overcomes the fact that Endo International's

---

[9] Endo International's activities are a far cry from those of a typical holding company's limited activities. *Cf. Johnson v. SmithKline Beecham Corp.*, 853 F. Supp. 2d 487, 491–92 (E.D. Pa. 2012) (determining that "nerve center" of a holding company whose only activities were "mak[ing] investments, pay[ing] out dividends, and approv[ing] restructurings" was location where board met to make those decisions).

executives work and direct its activities from its acknowledged U.S. headquarters in Pennsylvania. *See, e.g.*, Weingarten Ex. G (Endo Int'l 2020 10-K) at 14. Even taken at face value, the declaration from Endo International's Assistant Secretary creates at most a dispute of fact regarding the location of Endo International's principal place of business, and that dispute "must be resolved in the plaintiff's favor." *Bigelow v. Garrett*, 299 F. Supp. 3d 34, 41 (D.D.C. 2018).

## II.   The Court can exercise specific jurisdiction over Endo International because of its conduct related to the claims in this case

In contrast to general jurisdiction, which need not relate to the case at hand, "specific jurisdiction exists if a claim is related to or arises out of the non-resident defendant's contacts with the forum." *Vasquez v. Whole Foods Mkt., Inc.*, 302 F. Supp. 3d 36, 45-46 (D.D.C. 2018); *see also Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 175 (D.D.C. 2018) (specific personal jurisdiction requires that "suit-related conduct," measured by "[t]he contours of plaintiffs' claims," create a substantial connection with the forum). The Due Process Clause permits the exercise of specific jurisdiction as long as it would not offend "traditional notions of fair play and substantial justice."[10] *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945) (internal quotation marks and citation omitted). Here, the Court can exercise specific jurisdiction over Endo International.

---

[10] Endo International incorrectly applies the Due Process Clause's restriction to both general and specific jurisdiction. *See* Endo Int'l Mem. 15-16. The question of whether exercising personal jurisdiction over Endo International would offend traditional notions of fair play and substantial justice arises only "when specific jurisdiction is at issue." *Daimler*, 571 U.S. at 139 n.20.

A. **Endo International orchestrated its subsidiaries' actions and approved the 2017 Agreement**

The FTC alleges that the 2017 Agreement unlawfully restrains trade in the oxymorphone ER market. Endo International agrees that the "'contours' of [the FTC's] claims for purposes of the specific jurisdiction analysis" include "any plans to launch or license a generic version of oxymorphone ER." Endo Int'l Mem. 7. The allegations in the Complaint, supplemented by admissions in Endo's documents, show that Endo International's suit-related conduct included both approving the 2017 Agreement and coordinating across its subsidiaries the "plans to launch or license a generic version of oxymorphone ER" in the United States.

As the Complaint alleges, Endo International planned to terminate its subsidiary Par's effort to launch a new oxymorphone ER product in favor of a more lucrative option: sharing Impax's monopoly profits. Before approving the 2017 Agreement, Endo International had tapped Par to launch its next oxymorphone ER drug in the United States. Compl. ¶¶ 75-82. Endo International assigned Par employees to the working group on a replacement oxymorphone ER product (*Id*. ¶ 76); Endo International's CEO approved funds for Par's development of a new oxymorphone ER product (*Id*. ¶ 81); and Endo International received regular reports on Par's progress (*Id*. ¶¶ 78, 82). In 2018, it was the head of Endo International who "made the final decision" to terminate Par's oxymorphone ER development efforts to preserve payments from Impax. Weingarten Ex. L (Email from Brandon Rockwell to Endo employees (May 11, 2018)) at 1; Compl. ¶ 98. Endo International, therefore, planned and directed Par's efforts to launch an oxymorphone ER product and orchestrated an eventual halt to Par's work in favor of the division of the oxymorphone ER market.

In addition to controlling the development of Par's oxymorphone ER product, Endo International executives helped shape specifics of the 2017 Agreement. ████████████████

███████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████. *Id.*

Further, the terms of the 2017 Agreement itself demonstrate that Endo International approved the Agreement. Although its terms were confidential, the 2017 Agreement authorized Impax to issue a press release in a form attached to it. Ex. B to Endo Int'l Mem., 2017 Agreement, at ENDO 2019 OPANA CID 00010313. The press release attached to the 2017 Agreement describes the role "Endo International plc (Endo)" played in the 2017 Agreement, including receiving the "royalty" from Impax reflecting Endo's share of Impax's monopoly profits. *Id.* at ENDO 2019 OPANA CID 00010332. Paul Campanelli—CEO and president of both Endo International and Endo Pharmaceuticals—executed the 2017 Agreement, which included the press release. *Id.* at ENDO 2019 OPANA CID 00010315. Only an Endo International officer could authorize Impax to make statements about Endo International.

Endo International's arguments against specific jurisdiction—*i.e.*, that it "had nothing to do with it"—are meritless.

First, Endo International argues that specific jurisdiction is inappropriate because Endo International "had nothing to do with . . . any decision regarding whether or not *Endo Pharmaceuticals* would launch another version of oxymorphone ER." Endo Int'l Mem. 8 (emphasis added). But the FTC alleges that Endo International was developing an oxymorphone ER product via its Par subsidiary. Compl. ¶¶ 75-83. After securing a share of Impax's oxymorphone ER monopoly profits through the 2017 Agreement, Endo International halted that

13

development work. Compl. ¶¶ 83, 98. Endo International simply disregards these well-pleaded factual allegations.

Second, Endo International asserts that it lacked control over "day-to-day activities related to the regulatory approval, manufacture, distribution, sales, launch, or marketing of prescription medications in the United States." Endo Int'l Mem. 2; Voss Decl. ¶ 8. Endo again ignores the factual allegations in the Complaint. The Complaint alleges substantial direct participation by Endo International in U.S. activities relating to oxymorphone ER and the claims in this case. For example, Endo International stated that it had withdrawn Opana ER from the market in 2017 at the FDA's request. *Supra* at [4]. Likewise, Endo International neglects the fact that it directed Par's oxymorphone ER development efforts. Compl. ¶¶ 75-82.

Third, Endo International argues that it did not execute the 2017 Agreement and that Paul Campanelli—who served as President and CEO of both Endo International and Endo Pharmaceuticals—"signed the 2017 Contract Settlement Agreement in his capacity as President and CEO of Endo Pharmaceuticals." Endo Int'l Mem. 4, 8; *see also* Campanelli Decl. ¶ 4. But only an Endo International officer could authorize Impax to make statements about Endo International contained in the press release attached to the 2017 Agreement. Even assuming Mr. Campanelli can switch "corporate hats," he could not approve a press release characterizing Endo International's role in the 2017 agreement without wearing his Endo International "hat."

Endo International approved the 2017 Agreement and coordinated the unlawful allocation of the oxymorphone ER market memorialized in the 2017 Agreement. These are more than the minimum contacts necessary to satisfy due process.

14

**B.      Exercising specific jurisdiction over Endo International satisfies traditional notions of fair play and substantial justice**

Due Process requires that a defendant possess "certain minimum contacts with [the jurisdiction] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316 (internal quotation marks and citation omitted). Due process guarantees are satisfied "if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (internal quotation marks and citations omitted). "A court must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." *Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 113 (1987). But "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Mwani*, 417 F.3d at 14 (internal quotation marks and citation omitted). Endo International cannot meet that burden here.

All of the relevant factors demonstrate that jurisdiction is fair and reasonable. First, Endo International purposefully directed its activities at U.S. residents. For example, it was Endo International that acceded to the FDA's request to withdraw Opana ER from the U.S. market, coordinated its U.S. subsidiaries' development of a new oxymorphone ER product for sale in the United States, and planned to terminate a new product in favor of the 2017 Agreement's restrictions on competition in the U.S. market. *See supra* at [4-5].

Second, as to burden, Endo International offers the *ipse dixit* that the burden of this lawsuit would be "substantial" and that it "has no relevant connections to the United States related to this lawsuit." Endo Int'l Mem. 15-16. Yet, Endo International's U.S. sales, U.S.

headquarters, U.S.-based leadership, former domicile in the U.S., and conduct in divvying up the U.S. market for oxymorphone ER belie its attempts to paint itself as the prototypical foreign defendant hailed into an unfamiliar U.S. legal system. Endo International's appearances in federal court further demonstrate its familiarity with the U.S. legal system. When the FTC sued Endo International in 2016 for previous antitrust violations related to Opana ER, the company did not object to personal jurisdiction. *See* Weingarten Ex. M (Mem. of Law in Support of Mot. to Dismiss (Dkt. No. 69-2), *FTC v. Endo Pharms. Inc.*, No. 16-cv-1440 (E.D. Pa. July 12, 2016)) (moving to dismiss only on Rule 12(b)(6) grounds). Then, when the FTC voluntarily dismissed that action in favor of potentially refiling it where related private litigation was pending, Endo International filed a lawsuit to oppose the FTC's effort. *See* Weingarten Ex. N (Compl. ¶¶ 31, 52-58 (Dkt. No. 1), *Endo Pharms. Inc. v. FTC*, No. 2:16-cv-05600 (Oct. 26, 2016)).

As to the interest of the United States, Endo International recognizes the federal government's "strong interest in effective enforcement of the antitrust laws." Endo Int'l Mem. 15-16. Courts likewise recognize the "particular importance of promoting enforcement of antitrust laws" when exercising jurisdiction. *In re Vitamins Antitrust Litig.*, 270 F. Supp. 2d 15, 34 (D.D.C. 2003); *see also, e.g.*, *Dee-K Enters., Inc. v. Heveafil Sdn. Bhd.*, 982 F. Supp. 1138, 1148 (E.D. Va. 1997) (finding these interests outweighed burden on foreign defendant of litigating in U.S. federal court).

Finally, Endo's argument that its presence or absence "has no effect on the FTC's ability to obtain meaningful relief" (Endo Int'l Mem. 16) ignores the allegations and facts demonstrating Endo International's role in directing its subsidiaries to effectuate the unlawful allocation of the oxymorphone ER market with Impax. If the FTC fails to obtain relief against

Endo International, the company could engage in similar and related conduct in the future, on its own or through its subsidiaries.

**III.    The Court has jurisdiction over Endo International because it is the alter ego of Defendant Endo Pharmaceuticals**

The Court also has jurisdiction over Endo International because it is the "alter ego" of its subsidiary, Defendant Endo Pharmaceuticals. Endo Pharmaceuticals has the requisite minimum contacts with the United States by virtue of its U.S. incorporation and its suit-related conduct. Endo International concedes that the "contacts of a subsidiary may be attributed to a parent where a subsidiary is nothing more than the 'alter ego' of the parent corporation." Endo Int'l Mem. 10. Here, Endo International is the alter ego of Endo Pharmaceuticals because (1) "there [is] a unity of interest and ownership" between them, "such that their separate corporate personalities no longer exist," and (2) dismissing Endo International will cause "an inequitable result." *IMark Mktg. Servs., LLC v. Geoplast S.p.A.*, 753 F. Supp. 2d 141, 150 (D.D.C. 2010) (citation omitted). Notably, the U.S. District Court for the Northern District of California recently concluded that plaintiff San Francisco presented a *prima facie* case that Endo International is an alter ego of its U.S. subsidiaries, including Endo Pharmaceuticals. *See City & Cnty. of S.F. v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 641-44 (N.D. Cal. 2020).

**A.    Endo International actively and substantially controls Endo Pharmaceuticals**

The first prong of the alter-ego doctrine, "unity of interest," requires showing "active and substantial" control, distinct from "exclusive [control] in a hypertechnical or day-to-day sense." *Material Supply Int'l v. Sunmatch Indus. Co. Ltd.*, 62 F. Supp. 2d 13, 20 (D.D.C. 1999) (quoting *Valley Fin., Inc., v. United States*, 629 F.2d 162, 172 (D.C. Cir. 1980)). When a parent treats a subsidiary as a "business conduit" rather than a "distinct, responsible entity," "there is an increased justification, all other things equal," for piercing the corporate veil. *Labadie Coal Co.*

*v. Black*, 672 F.2d 92, 97 (D.C. Cir. 1982). The allegations and materials here demonstrate Endo International's active and substantial control over Endo Pharmaceuticals.

Endo International's leadership overlaps with Endo Pharmaceuticals. Compl. ¶ 14. At the time of the 2017 Agreement, three of Endo International's five executive officers were also executive officers of Endo Pharmaceuticals, including Mr. Campanelli who was president and CEO of both entities when he signed the 2017 Agreement. Campanelli Decl. ¶¶ 2-3.[11] Having three common executive officers is "indicative of a unity of interest and ownership," *IMark Mktg. Servs.*, 753 F. Supp. 2d at 152, as is sharing a president and CEO. *Empson & Co., S.R.L. v. Mar-Salle Imports, Ltd.*, No. Civ. A. 86-1944, 1987 WL 12793, at *3 (D.D.C. June 12, 1987).

In addition, Endo International's U.S. headquarters and Endo Pharmaceuticals' principal place of business are both located in the same facility in Pennsylvania (Compl. ¶¶ 12, 14), which further suggests a unity of interest and ownership. *See Labadie*, 672 F.2d at 99. The "undifferentiated use of office equipment . . . by dual employees" also suggests an alter ego relationship. *Johnson-Tanner v. First Cash Fin. Servs., Inc.*, 239 F. Supp. 2d 34, 39 (D.D.C. 2003) (internal citations omitted). The former president and CEO of both entities, Mr. Campanelli, kept his regular office in the United States. Compl. ¶¶ 12, 14; *see also* Weingarten Ex. Q (Campanelli Exec. Employ. Agmt. (2019)) at 4-5.

Endo International exercises direct control over Endo Pharmaceuticals via the Endo International Code of Conduct, which "governs . . . internal and external interactions," "applies to every person conducting business for Endo and to all Endo locations, subsidiaries and

---

[11] Three members of Endo International's executive leadership overlap with the executive leadership of Endo Pharmaceuticals at the time of the 2017 Agreement. *Compare* Weingarten Ex. O (Endo Int'l 2017 10-K) at 5, *with* Weingarten Ex. P (Endo Pharmaceuticals Inc., Massachusetts Annual Report for FY 17) at 1.

affiliates," and imposes penalties upon any violators. Weingarten Ex. R (Endo Independent

Directors' Report (Oct. 2018)) at 4. This "high degree of oversight and management activity"—

including disciplinary control—is "extremely relevant" and weighs in favor finding a unity of

interest. *See Johnson-Tanner*, 239 F. Supp. 2d at 40. Endo International and Endo

Pharmaceuticals also share trade names, logos, and websites. Compl. ¶ 14. Even though a

common image "without more" is not dispositive of an alter ego relationship, it is "nonetheless

relevant" and indicative of active and substantial control. *IMark Mktg. Servs.*, 753 F. Supp. 2d at

151 (quoting *Diamond Chem. Co. v. Atofina Chems., Inc.*, 268 F. Supp. 2d 1, 8-9 (D.D.C.

2003)).

      Another federal court recently concluded that Endo International "governs . . . [Endo

Pharmaceuticals'] internal and external interactions," by, for example, prescribing, monitoring,

and correcting the behavior of Endo Pharmaceuticals' employees via its Code of Conduct.

*Purdue Pharma*, 491 F. Supp. 3d at 641-42. This control over "day-to-day employment issues"

and "routine sales decisions" suffices to "demonstrate a pervasive level of control." *Id.* at 642

(internal quotation marks and citations omitted). That court also relied upon the fact that Endo

International has virtually identical officers and directors as its U.S. subsidiaries. *Id.* at 643.

      Endo International's arguments rest on treating each of these facts as insufficient on its

own, as opposed to arguing that they are insufficient together. Endo International's insistence

that having overlapping "directors" is "entirely appropriate" and cannot "alone" prove alter ego

(Endo Int'l Mem. 8-9, 12) misses the point. It also ignores Endo International's control over

Endo Pharmaceuticals and the other significant overlaps between the two—including their

shared office space and shared trade names, logos, and websites. Compl. ¶¶ 12, 14.

Similarly unpersuasive is the declaration that "Endo International['s] . . . officers, in their role[s] as officers of Endo International . . . , do not exercise direct control over its subsidiaries' day to day activities related to . . . pharmaceutical products in the United States." Voss Decl. ¶ 8. Though Ms. Voss speaks of "direct control over . . . day to day activities" (*id.*), the relevant legal standard is proof of active and substantial control, not "exclusive [control] in a hypertechnical or day-to-day sense." *Material Supply Int'l*, 62 F. Supp. 2d at 20 (quoting *Valley Fin., Inc.*, 629 F.2d at 172). The FTC has shown—and the declaration does not dispute—the established overlap in leadership and its relevance to the unity of interest analysis. Regardless, the declaration contradicts Endo International's own prior characterization of its Code of Conduct as "govern[ing] . . . internal and external interactions," and "appli[cable] to every person conducting business for Endo and to all Endo locations, subsidiaries and affiliates." Weingarten Ex. R (Endo Independent Directors' Report (Oct. 2018)) at 4.

Endo International's reliance on *Adm'rs of the Tulane Educ. Fund v. Ipsen Pharma, S.A.S.,* 770 F. Supp. 2d 24 (D.D.C. 2011) (cited in Endo Int'l Mem. 12), and *Sapieyevski v. Live Nation Worldwide, Inc.*, No. 18-cv-830, 2020 WL 4432119 (D.D.C. July 31, 2020) (cited in Endo Int'l Mem. 13), is misplaced. Those cases merely concluded, based on those specific facts, that there was insufficient evidence to pierce the corporate veil and attribute a subsidiary's patent to its parent company. The allegations and extrinsic materials here go well beyond the bare bones allegations in those cases.

### B.    Fairness supports a finding of alter ego

Under the second prong of the alter ego doctrine, Endo International should be held the alter ego of Endo Pharmaceuticals as a "basic issue of fairness." *Labadie*, 672 F.2d at 96. Proof of fraud or "willfully wrong[ful]" conduct is unnecessary. *Id*. at 100. This prong is satisfied if "it would create an injustice to permit [a parent entity] to escape the consequences of its substantial

connection to [its subsidiary]'s . . . practices" where the unity of interest between them "is evident." *Johnson-Tanner*, 239 F. Supp. 2d at 41. Here, Endo International used various subsidiaries, including Endo Pharmaceuticals, to effectuate the unlawful restraint of trade. An effective antitrust remedy prevents the unlawful conduct from recurring. *See U.S. v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001) (en banc, per curiam). But if Endo International is dismissed, the FTC may be precluded from enjoining it from using other subsidiaries to engage in the same or similar conduct. Indeed, in April 2021, after the FTC filed the Complaint here, the Fifth Circuit upheld the FTC's determination that the 2010 settlement agreement between Impax and Endo Pharmaceuticals was an illegal agreement "to preserve and split monopoly profits" on oxymorphone ER. *Impax Labs., Inc. v. FTC*, 994 F.3d 484, 500 (5th Cir. 2021). Endo International should not escape the consequences of its conduct—through its alter ego, Endo Pharmaceuticals—to restrain trade in the market for oxymorphone ER.

## IV.    The Complaint states a claim against Endo International

Endo International's assertion that the Complaint fails to plausibly allege that it "participated in or agreed to join" the agreement to restrain trade (Endo Int'l Mem. 16 (citation omitted)) improperly relies on extrinsic evidence and ignores the allegations in the Complaint. The Complaint alleges that corporate officers from Endo International negotiated and approved the challenged agreement and that the President of Endo International made the ultimate decision to enter the 2017 Agreement. Compl. ¶ 14. Abandoning plans to reenter and compete in the oxymorphone ER market in favor of splitting Impax's monopoly profits was a more profitable outcome for Endo International. *Id.* ¶¶ 105, 107.

Furthermore, a claim that an agreement is an unlawful restraint of trade is not limited solely to the named parties to the agreement. For example, in *FTC v. Mylan Labs., Inc.*, the court declined to dismiss a defendant who was not a named party to the allegedly unlawful agreements

21

because the defendant was alleged to have "materially aided in the creation of the agreements," including that it "was present at and participated in the negotiations" of the agreements and "benefitted financially from the[ir] existence." 62 F. Supp. 2d 25, 55-56 (D.D.C. 1999). The FTC has alleged the same about Endo International here.

More fundamentally, Endo International's bare assertion that it "had nothing to do with" the 2017 Agreement (Endo Int'l Mem. 17) raises an issue of fact that is inappropriate for resolution on a motion to dismiss. Its reliance on declarations from its executives about its involvement and its relationship to Endo Pharmaceuticals (*Id.* at 16-18) is inappropriate support for its request to dismiss pursuant to Rule 12(b)(6). The Court should disregard these declarations and the arguments relying on them, and deny the motion to dismiss for failure to state a claim.

## CONCLUSION

For the foregoing reasons, the Court should deny Endo International's Motion to Dismiss (Dkt. No. 53).

Dated:  June 10, 2021                                    Respectfully submitted,

*/s/ James H. Weingarten*
James H. Weingarten (DC Bar No. 985070)
Evan J. Cartagena
Emma Dick
Garth Huston (DC Bar No. 980609)
Markus Meier (DC Bar No. 459715)
Kara Monahan
Eric M. Sprague
Jamie Towey (DC Bar No. 475969)
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-3570
jweingarten@ftc.gov

*Counsel for Plaintiff*
*Federal Trade Commission*

22

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of June, 2021, I have electronically filed a true and correct copy of Plaintiff Federal Trade Commission's Opposition to Specially Appearing Defendant Endo International plc's Motion to Dismiss Complaint for Lack of Personal Jurisdiction or for Failure to State a Claim (Dkt. No. 53) with the Clerk of the Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all counsel of record.

Dated: June 10, 2021

*/s/ James H. Weingarten*
James H. Weingarten
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-3570
jweingarten@ftc.gov

*Counsel for Plaintiff*
*Federal Trade Commission*