**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:21-cv-00217-RCL |
| ) | |
| ENDO PHARMACEUTICALS, INC., et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF THE IMPAX DEFENDANTS'
MOTION TO DISMISS**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.     THE COMPLAINT FAILS TO ALLEGE ANTICOMPETITIVE CONDUCT
      UNDER THE SHERMAN ACT. ................................................................................ 2

       A.    The Complaint Fails to Allege an Unlawful Agreement in Restraint of
            Trade Under Sherman Act §1. ................................................................... 2

       B.    The Complaint Fails to Allege Monopolization Under Sherman Act §2. ............. 8

II.    THE TIERED ROYALTY LICENSE IS WITHIN THE RIGHTS PROVIDED
      BY ENDO'S LAWFUL PATENT MONOPOLY ........................................................... 11

III.   THE COMPLAINT FAILS TO ALLEGE ANTICOMPETITIVE EFFECT................... 20

CONCLUSION.................................................................................................................... 22

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*In re Aggrenox Antitrust Litig.,*
    94 F. Supp. 3d 224 (D. Conn. 2015) ........................................................................17

*In re Androgel Antitrust Litig. (No. II),*
    No. 09-cv-955, 2018 WL 2984873 (N.D. Ga. June 14, 2018) ................................11

*B. Braun Medical Inc. v. Abbott Labs.,*
    124 F.3d 1419 (Fed. Cir. 1997) .............................................................................15

*\*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.,*
    784 F.2d 1325 (7th Cir. 1986) ...............................................................................10

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (1955) ...............................................................................................6

*Citizen Publishing Co. v. United States,*
    394 U.S. 131 (1969) ...............................................................................................7

*Diamond Coating Techs., LLC v. Hyundai Motor Am.,*
    823 F.3d 615 (Fed. Cir. 2016) ...............................................................................10

*Endo Pharms., Inc. v. Impax Labs., Inc.,*
    No. 16-cv-2526, 2016 WL 6246773 (D.N.J. Oct. 25, 2016) ................................13

*FTC v. Actavis,*
    570 U.S. 136 (2013) ...............................................................................16, 17, 20

*FTC v. Facebook, Inc.,*
    No. 20-cv-3590, 2021 WL 2643627 (D.D.C. June 28, 2021) ...........................8, 10

*FTC v. Mylan Labs. Inc.,*
    62 F. Supp. 2d 25 (D.D.C. 1999) ...........................................................................9

*FTC v. Surescripts, LLC,*
    424 F. Supp. 3d 92 (D.D.C. 2019) ..........................................................................7

*\*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.,*
    627 F.2d 919 (9th Cir. 1980) ...............................................................................9, 10

*King Drug Co. of Florence v. Smithkline Beecham Corp.,*
    791 F.3d 388 (3d Cir. 2015) ..............................................................................11, 17

\*Authorities upon which defendants Impax Laboratories, LLC and Amneal Pharmaceuticals, Inc. chiefly rely are marked with asterisks.

*Miller Insituform, Inc. v. Insituform of N. Am., Inc.*,
  605 F. Supp. 1125 (M.D. Tenn. 1985), *aff'd*, 830 F.2d 606 (6th Cir. 1987) ..........................18

*MiniFrame Ltd. v. Microsoft Corp.*,
  No. 11-cv-7419, 2013 WL 1385704 (S.D.N.Y. Mar. 28, 2013), *aff'd*, 551 F.
  App'x 1 (2d Cir. 2013)................................................................................................15

*N. Sec. Co. v. United States*,
  193 U.S. 197 (1904)........................................................................................................7

*In re Nexium (Esomeprazole) Antitrust Litig.*,
  968 F. Supp. 2d 367 (D. Mass 2013) ............................................................................11

*Nuvasive, Inc. v. Cadwell Indus., Inc.*,
  No. 12-cv-3065, 2013 WL 12096625 (S.D. Cal. Nov. 4, 2013)...................................15

*Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*,
  81 F. Supp. 3d 1 (D.D.C. 2015)....................................................................................11

*Palmer v. BRG of Georgia*,
  498 U.S. 46 (1990)......................................................................................................6, 7

\*Pfizer, Inc. v. Heckler*,
  735 F.2d 1502 (D.C. Cir. 1984) ....................................................................................12

*Pharm. Rsch. and Mfrs. of Am. v. FTC*,
  790 F.3d 198 (D.C. Cir. 2015) ......................................................................................18

*SCM Corp. v. Xerox Corp.*,
  645 F.2d 1195 (2d Cir. 1981)...................................................................................16, 17

*Spinelli v. National Football League*,
  96 F. Supp. 3d 81 (S.D.N.Y. 2015)...............................................................................12

*Staley v. Gilead Scis., Inc.*,
  446 F. Supp. 3d 578 (N.D. Cal. 2020) ..........................................................................15

*Tampa Elec. Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961)........................................................................................................6

*United States v. E. I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956)........................................................................................................9

\*United States v. Gen. Elec. Co.*,
  272 U.S. 476 (1926).................................................................................................16, 17

\*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966)...................................................................................................8, 10

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ................................................................................................9, 15

\*_United States v. Studiengesellschaft Kohle, m.b.H._,
  670 F.2d 1122 (D.C. Cir. 1981) ..................................................................12, 15, 17, 19

*United States v. Syufy Enterprises*,
  903 F.2d 659 (9th Cir. 1990) ................................................................................................10

*Wegmann v. London*,
  648 F.2d 1072 (5th Cir. 1981) ................................................................................................7

**Statutes**

35 U.S.C. §261 ................................................................................................................................18

35 U.S.C. §283 ................................................................................................................................22

**Other Authorities**

1 ECKSTROM LICENSING IN FOR. & DOM. OPS. §§3.31, 5.5 ................................................3

3 MILGRIM ON LICENSING §18.32 ................................................................................................3

Thomas R. Varner, *An Economic Perspective on Patent Licensing Structure and
  Provisions*, 47 les Nouvelles 28 (2012) ................................................................................3

**INTRODUCTION**

There is a fundamental mismatch between the facts FTC alleges and the legal theories FTC advances.  Even viewed in a light most favorable to FTC, the story FTC tells is nothing more than routine patent licensing.  Endo possesses a lawful oxymorphone ER patent monopoly that it has now successfully defended in infringement litigation against several generic manufacturers. Impax negotiated a license to Endo's patents, but the parties later disputed the terms of the license with respect to royalties.  In the 2017 Settlement, Impax and Endo agreed to a compromise tiered royalty license.  That license left Endo entirely free to compete with Impax if Endo wished to, while also providing for a royalty step-down to account for the diminished value of Impax's license in a more competitive environment.  The license did not purport to expand or extend Endo's lawful patent monopoly.  And for nine months after the parties executed the settlement, Endo continued efforts to launch or relaunch a new oxymorphone ER product, before deciding to cease development of opioid products altogether for reasons unrelated to the 2017 Settlement.

FTC argues that those facts make *Impax* a monopolist with the power to control prices and exclude competition.  Yet Endo is the patentholder, and Impax possesses only a royalty-bearing license that does not even purport to exclude competition.  FTC tries to maneuver around that problem by characterizing the license as the functional equivalent of an exclusive license to Impax due to the "financial incentives" of the tiered royalty arrangement.  But that conclusory allegation is at odds with the terms of the parties' actual agreement.  And FTC runs straight into the equally insuperable obstacle that the patent laws *permit* Endo to grant an exclusive license, and the antitrust laws come into play only if FTC can allege abuse or manipulation of the license in a way that effectively expands or extends Endo's lawful patent monopoly.  FTC has not alleged such facts, nor could it.  Instead, FTC tries to draw vague parallels to *Actavis*-style reverse payment settlements.  That comparison does not work, either:  Whereas *Actavis* involved an effort by a

patentholder to fend off challenges to weak or doubtful patents by paying off potential competitors—the reverse of a typical payment flow—the 2017 Settlement involves ordinary royalty payments by a licensee to a patentholder whose patents have already been held valid.  FTC cannot overcome those facts by labeling the licensee a "monopolist" and the patentholder a "potential competitor."

FTC's novel theory and unprecedented attempt to stretch the antitrust laws to reach the tiered royalty license at issue here would have far-reaching consequences.  Such licenses are common in patent and other intellectual property settings because they allow parties to account for the possibility that the license will diminish in value.  If these arrangements are now suddenly suspect under the antitrust laws—despite being within the powers granted by the patent laws— patentholders and licensees will be reluctant to settle licensing litigation or enter licensing arrangements that might lead to risky, uncertain, and massively expensive antitrust litigation.  FTC should not receive a blank check to subject licensing arrangements authorized by the patent laws to antitrust scrutiny.

## **ARGUMENT**

## I.   THE COMPLAINT FAILS TO ALLEGE ANTICOMPETITIVE CONDUCT UNDER THE SHERMAN ACT.

### A.   The Complaint Fails to Allege an Unlawful Agreement in Restraint of Trade Under Sherman Act §1.

FTC has not pled a viable §1 claim.  To plead a violation of §1, FTC must allege facts that, if true, would plausibly show that Impax and Endo entered an unlawful agreement to restrain trade.  The agreement at issue here is a tiered royalty license that represents a compromise between Impax's and Endo's conflicting positions on the royalties owed by Impax to Endo.  Tiered royalty

arrangements are commonplace and protect licensees from changing market circumstances.[1]  As FTC does not dispute, the plain terms of the 2017 Settlement ████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████  .  FTC tries to make out a claim that the practical effect of the licensing agreement nevertheless constitutes an agreement not to compete because it eliminates Endo's financial incentive to compete.  But a party's unilateral response to an *incentive* is not an *agreement* not to compete.  And even if it could be, FTC's complaint comes nowhere near alleging facts that, if true, would show that the tiered royalty license actually eliminates Endo's financial incentive to compete.  (Impax Mem.11-16.)

In response, FTC presents spin, not factual allegations.  After attempting to paint Defendants with guilt by association by recounting separate litigation not at issue here (Opp.3-4), FTC tries to take the anodyne set of facts alleged in the complaint and slot them into an antitrust theory.  In FTC's telling, Impax and Endo are horizontal competitors that agreed to split Impax's monopoly profits as long as Endo stayed off the market.  (Opp.12-14.)  The trouble for FTC is that the facts actually alleged in the complaint, taken as true, do not fit FTC's antitrust theory.

To begin, FTC's argument that Impax and Endo are horizontal competitors contains multiple logical holes.  (*See* Opp.11-12.)  As FTC tacitly acknowledges, Impax and Endo were not actually horizontal competitors at the time the 2017 Settlement was executed.  At that time, only Impax was on the market because other generic manufacturers had all lost their patent litigation

---

[1]   FTC takes issue with Defendants' description of tiered royalty arrangements as "common," contending that this is a "factual" assertion that "cannot be considered on a motion to dismiss." (Opp.19 n.11.)  But FTC does not actually dispute that such arrangements are common in patent and other intellectual property licensing, and treatises attest to their frequent use.  *See, e.g.*, 1 ECKSTROM LICENSING IN FOR. & DOM. OPS. §§3.31, 5.5; 3 MILGRIM ON LICENSING §18.32; Thomas R. Varner, *An Economic Perspective on Patent Licensing Structure and Provisions*, 47 les Nouvelles 28, 33-34 (2012).

against Endo and been enjoined from the market, and Endo itself had removed its product from the market at FDA's request.  (Compl. ¶¶50-56, 69-70.)  FTC tries to get around that problem by arguing that Endo was still a potential competitor because Endo was "actively planning" to launch or license a new oxymorphone ER product at the time of the 2017 Settlement.  (Opp.11.)  Stripped of their spin, however, FTC's factual allegations state only that Endo was "exploring," "consider[ing]," and expressing interest in various possible options.  (Compl. ¶¶71-74.)  FTC also maintains that Impax's broad license makes it a horizontal competitor "beyond the reach of Endo's patents" because Endo "waived" its patentholder rights when it granted the license.  (Opp.12.)  As explained further below, however, *see infra* at 12-14, that assertion, which FTC fails to support with any legal authority or factual allegations, is question-begging because it assumes the very issue the parties were litigating when they executed the 2017 Settlement: the scope of the license.

FTC's contention that the 2017 Settlement contained an agreement not to compete is similarly flawed and essentially boils down to *ipse dixit*.  (*See* Opp.13-14.)  FTC meanders through various examples of "naked" agreements not to compete (*id.* at 13), but implicitly acknowledges (as it must) that the 2017 Settlement does not contain anything resembling a "naked" agreement not to compete.  Instead, FTC maintains, the 2017 Settlement "functions" as an agreement not to compete because—FTC states—Impax's royalty payments to Endo are "contingent on, and in exchange for, Endo's agreement to stay out of the market."  (*Id.*)  Yet again, there is an enormous gap between that claim and the facts FTC actually alleges in the complaint.  As those facts demonstrate, the parties did not just sit down one day and decide to "split" what FTC characterizes as Impax's monopoly profits "in exchange for" Endo's "agreement" to stay off the market.  Instead, the parties were embroiled in litigation over whether Impax owed Endo a 0% royalty or an 85% royalty under the license granted in the 2010 Settlement and whether Impax was violating

4

Endo's patents.  (*See* Compl. ¶¶85-90; Impax Mem.5-6); *see generally Endo Pharms., Inc. v. Impax Labs., Inc.*, No. 16-cv-2526, Dkt. No. 13 (D.N.J. Aug. 1, 2016).  After Impax lost its motion to dismiss Endo's lawsuit, the parties worked out a compromise rather than continue with risky and uncertain litigation.  (*See* Compl. ¶¶92, 94; Impax Mem.6-7.)  That compromise essentially split the difference between the parties' positions, granting Endo a lower ███ royalty but also providing that Impax would have ██████████████ if market conditions changed and caused the value of Impax's license to drop.  (*See* Compl. ¶¶88-94; Impax Mem.6-7.)  While FTC attempts to downplay that crucial context in order to lend credence to its narrative that Endo "agreed" to stay off the market "in exchange for" ███ of Impax's profits, FTC notably fails to allege *any* facts showing that the 2017 Settlement was anything other than a compromise of the parties' litigation positions.[2]

Lacking such facts, FTC repeats its conclusory claim that the "practical effect" of the 2017 Settlement is to "eliminate" Endo's "financial incentive to compete."  (Opp.14, 30.)  Impax already explained why that claim does not follow from the facts FTC alleges:  It improperly assumes, without alleging facts showing, that there are *no* scenarios in which Endo could be better off competing with Impax than collecting a ███ royalty payment.  (Impax Mem.14-16.)  That assumption would fail to meet the plausibility pleading standard in any case, but particularly in a case like the one here, where Endo could launch a reformulated product that would not compete directly with Impax's generic.  (*Id.* at 15; *see* Compl. ¶73.)  FTC tries to wave that complication

---

[2]   FTC also points to the provision of the 2017 Settlement ████████████████████████████████████ ████████████████████████████████████████████████████████████ (Opp.14.)  Not so.  In the context of the parties' settlement of their conflicting positions regarding royalty payments and the value of Impax's license, that provision simply insures that the value of Impax's license will not be affected by any third-party infringement of Endo's patents.

away by asserting that it is "internally inconsistent" to think that Endo could both maintain a high price for a safer reformulated product and capture a majority of oxymorphone ER sales.  (Opp.32.) But there is no "inconsistency"; if a reformulated product is both perceived to be safer than the original formulation and is not AB-rated to the original, it is perfectly conceivable that it could command a relatively higher price than an AB-rated direct competitor and capture a majority of overall oxymorphone ER sales.  FTC also misses the mark when it contends that this argument "simply ignores" the complaint's allegations.  (*Id.*)  For FTC's §1 theory to work, FTC's complaint must allege facts showing that the 2017 Settlement truly foreclosed competition because there is *no* scenario in which Endo would be better off competing than staying off the market.  (*See* Impax Mem.16.)  It is not enough for FTC to state the conclusion and call it a factual allegation.  Because FTC's factual allegations fail to foreclose possible scenarios in which Endo might be better off competing, FTC's complaint fails to allege that the 2017 Settlement actually excludes competition. *Cf. Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (1955) (without "further factual enhancement," allegation of parallel conduct "stops short of the line between possibility and plausibility").

Notably, FTC cites no relevant case law allowing a §1 claim to proceed on such flimsy factual allegations about de facto effects.  FTC cites *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961), but that Clayton Act case concerned a very different arrangement—a requirements contract for coal—that the Court anyhow only assumed, without deciding, qualified as a potentially anticompetitive exclusive-dealing agreement.  *Id.* at 324, 329-30; (*see* Opp.14, 30). FTC also states that the 2017 Settlement "[i]n many respects" "resembles" the agreement held unlawful in *Palmer v. BRG of Georgia*, 498 U.S. 46 (1990).  (Opp.16.)  Yet it would be hard to come up with an agreement that resembles the 2017 Settlement *less*.  The agreement in *Palmer* contained not one, but two *express* covenants not to compete, one committing a provider of bar

review courses not to "directly or indirectly" engage in "any business" involved in bar preparation in the state of Georgia, and the other forbidding the counterparty from competing outside the state of Georgia.  498 U.S. at 47 n.2.  Here, by contrast, the 2017 Settlement ████████████████████ ███████████████████████████████████████████████████████.  *Palmer* is wholly inapposite.

FTC next offers up *FTC v. Surescripts, LLC*, 424 F. Supp. 3d 92 (D.D.C. 2019), but that case is also inapposite.  (*See* Opp.30.)  *Surescripts* concerned a §2 monopoly claim, not a §1 claim, and therefore did not analyze whether FTC alleged sufficient facts to state a §1 claim for an unlawful agreement in restraint of trade.  424 F. Supp. 3d at 100-02.  Instead, the court considered whether FTC alleged facts sufficient to show that the "practical effect" of loyalty rebate programs would encourage customers not to purchase through rival platforms.  *Id.* at 101.  *Surescripts* does not address what would be required to allege the type of de facto horizontal non-compete that the FTC alleges here.  FTC's remaining cases are no more helpful.  (*See* Opp.31-32.)  In *Citizen Publishing Co. v. United States*, 394 U.S. 131 (1969), the Court held an agreement between two newspapers anticompetitive because it contained price-fixing, profit-pooling "pursuant to an inflexible ratio," and geographic market division—none of which FTC alleges here.  *Id.* at 134, 135-36.  In *N. Sec. Co. v. United States*, 193 U.S. 197 (1904), the Court held unlawful an arrangement in which two railroads formed a holding company in order to merge operations and profits—again, nothing like the facts alleged here.  And in *Wegmann v. London*, 648 F.2d 1072 (5th Cir. 1981), the Fifth Circuit decided only that it had subject matter jurisdiction over a §1 claim, noting that a decision on the sufficiency of the plaintiff's factual allegations would be "premature." *Id.* at 1073-74 & 1074 n.4.

FTC has offered conclusory claims, rather than factual allegations, to support its §1 count, and FTC has provided no case law supporting its novel and unprecedented theory. This claim should be dismissed.

**B.      The Complaint Fails to Allege Monopolization Under Sherman Act §2.**

FTC has also failed to plead a §2 claim. The "existence of market power is at the heart of any monopolization claim." *FTC v. Facebook, Inc.*, No. 20-cv-3590, 2021 WL 2643627, at *14 (D.D.C. June 28, 2021). Yet the complaint's allegations of monopoly power are wholly conclusory and unsupported. Because Endo is entirely free to compete with Impax, Impax does not possess the monopoly power to exclude competition. And the facts alleged in the complaint come nowhere close to showing that Impax engaged in any kind of typical anticompetitive behavior, such as predatory pricing or refusal to deal with competitors. (Impax Mem.17-19.)

FTC has not alleged that Impax possesses monopoly power. Monopoly power is "the power to control prices or exclude competition" in a given market. *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966). Because the terms of the 2017 Settlement ████████████ ███████████████████████████, Impax plainly does not possess the power to exclude competition in the market for oxymorphone ER products.[3]   FTC makes little effort to contend otherwise.[4]   Instead, FTC argues that Impax possesses the power to control prices.

---

[3]   FTC's complaint defines the relevant market as the market for "extended-release oxymorphone tablets approved by FDA for sale in the United States." (Compl. ¶110.) Impax assumes that market definition for the sake of argument at the motion to dismiss stage but does not concede it and reserves the right to dispute it at a later stage if necessary. (*See* Impax Mem.17.)

[4]   FTC tries to work around the problem that the 2017 Settlement leaves Endo free to compete by asserting that, although Impax "does not inherently possess the power to exclude" competitors, Impax "purchased that power" in the 2017 Settlement by "pay[ing] Endo" not to compete. (Opp.34.) That is just a repackaged version of FTC's inadequate §1 claim that the "practical effect" of the 2017 Settlement is to foreclose Endo from competing, and it fails for the reasons already discussed in connection with §1.

(Opp.33-34.)  FTC ignores, however, that "[p]rice and competition are so intimately entwined that any discussion of theory must treat them as one," and "[i]t is inconceivable that price could be controlled without power over competition or vice versa."  *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 392 (1956).  FTC does not explain how Impax can control prices if it possesses no power to exclude competition.  Indeed, it is common sense that it cannot.  If Impax raised prices above competitive levels, Endo could enter, undercut Impax's prices, and take back all of the market profits (rather than just a ███ royalty).

More fundamentally, FTC has no satisfactory response to the point that the price fluctuations it alleges say nothing about whether *Impax* can control prices.  Endo, not Impax, possesses patents—and therefore a lawful monopoly—covering Opana ER.  Endo granted Impax a license to those patents, but also ████████████████████████████████████████ ████████████████████████████.  (*See* Compl. ¶¶92, 94; Impax Mem.6-7, 12-14.)  Absent plausible allegations showing that the 2017 Settlement actually precludes Endo from exercising its patent monopoly, which FTC has not provided, the complaint does not assert that *Impax* has the power to control prices.[5]

FTC also tries to "infer" monopoly power from Impax's share of the market.  (Opp.33.) FTC ignores, however, that "looking to current market share alone can be 'misleading'" because of "the possibility of competition from new entrants."  *United States v. Microsoft Corp.*, 253 F.3d 34, 54 (D.C. Cir. 2001) (quoting *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924

---

[5]   FTC's cases do not help.  (*See* Opp.33 (citing *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001); *FTC v. Mylan Labs. Inc.*, 62 F. Supp. 2d 25, 54-55 (D.D.C. 1999)).) Neither case concerned or analyzed an allegation of price control by a patent licensee that possessed no power to exclude the patentholder from competing.  Moreover, *Mylan* addressed much more specific and dramatic allegations of price control, specifying bottle size and strength and alleging price increases of 1,900% to over 3,200%.  *See* 62 F. Supp. 2d at 34, 54.

(9th Cir. 1980)).  "Blind reliance upon market share, divorced from commercial reality, could give a misleading picture of a firm's actual ability to control prices or exclude competition," the touchstones of monopoly power.  *Hunt-Wesson Foods*, 627 F.2d at 924; *see also Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1336 (7th Cir. 1986) ("Market share is just a way of estimating market power, which is the ultimate consideration.  When there are better ways to estimate market power, the court should use them."); *United States v. Syufy Enterprises*, 903 F.2d 659, 665-66 (9th Cir. 1990) ("In evaluating monopoly power, it is not market share that counts, but the ability to *maintain* market share.").  Here, as explained, the commercial reality is that Impax does not possess the power to control prices or exclude competition.  Impax is a mere licensee, without even the ability to assign or sublicense its rights or pursue claims against other potential entrants.  *See, e.g.*, *Diamond Coating Techs., LLC v. Hyundai Motor Am.*, 823 F.3d 615, 618-20 (Fed. Cir. 2016) (rights to sue accused infringers and grant licenses are core powers of patentee); (Impax Mem. Ex.1, §4.1(a) (Impax's license is non-transferable and non-sublicensable); *id.* §4.6 (Endo has sole right to defend patents)).  Because ███████████████████████████████ ████████████████████████, Impax's market share today does not "indicate power over sales and price tomorrow," *Ball Mem'l Hosp.*, 784 F.2d at 1336, and blind reliance on market share would be inappropriate.  *Cf. Facebook*, 2021 WL 2643627, at *14 (dismissing monopolization claim where FTC alleged "almost nothing concrete" about market power); *see also id.* at *12 (collecting cases with insufficient and conclusory allegations of market power).

FTC has also not alleged the "willful acquisition or maintenance" of monopoly power through anticompetitive or exclusionary conduct.  *Grinnell*, 384 U.S. at 571.  FTC does not dispute that the complaint fails to allege typical anticompetitive conduct, such as predatory pricing or refusal to deal with competitors.  Instead, FTC recycles the narrative it uses in connection with its

§1 claim, characterizing the 2017 Settlement as an "agreement to pay Endo not to compete and to block all other potential entrants."  (Opp.34.)  For the reasons already explained, *see supra* at 2-8, FTC's complaint does not actually allege facts sufficient to support that characterization of the 2017 Settlement.  With no other theory of anticompetitive conduct, FTC's complaint fails to allege a necessary component of a §2 monopolization claim.[6]

## II.   THE TIERED ROYALTY LICENSE IS WITHIN THE RIGHTS PROVIDED BY ENDO'S LAWFUL PATENT MONOPOLY.

FTC's complaint must be dismissed for the independent reason that it challenges a tiered royalty license that falls well within the rights Endo possesses as the holder of a lawful patent covering Opana ER.  The patent laws grant Endo a lawful monopoly over Opana ER for the duration of Endo's patents.  As a lawful incident to the right to exclude under its patents, Endo may also grant an exclusive license to those patents, forbidding everyone but the exclusive licensee from practicing the patents.  The patent laws leave Endo free to grant an exclusive license without fear of transgressing the antitrust laws as long as Endo does not attach conditions or abuse the licensing power in a way that effectively enlarges its lawful patent monopoly.  The tiered royalty licensing arrangement in the 2017 Settlement is *less* restrictive than a lawful exclusive license because it ███████████████████████████████████████████████.  If Endo can

---

[6]   The cases FTC cites (*see* Opp.34) are inapposite.  Three concerned settlements that—unlike the 2017 Settlement—actually contained *commitments not to compete*, either by a brand manufacturer committing to refrain from launching an authorized generic or by a generic manufacturer committing to refrain from entering the market for a certain period.  *See King Drug Co. of Florence v. Smithkline Beecham Corp.*, 791 F.3d 388, 393-94, 404-06 (3d Cir. 2015) (no-AG commitment); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 389-93 (D. Mass 2013) (no-AG commitment); *In re Androgel Antitrust Litig. (No. II)*, No. 09-cv-955, 2018 WL 2984873, at *3-4 (N.D. Ga. June 14, 2018) (commitment to delay entry).  The fourth case concerned specific and detailed allegations of two railroads' agreement not to compete, including through a fuel surcharge conspiracy and a commitment not to compete for each other's customers in certain areas.  *Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*, 81 F. Supp. 3d 1, 11-15 (D.D.C. 2015).

grant an *exclusive* license to Impax without offending the antitrust laws, it necessarily can also grant a *less restrictive* license—as it did here—without offending antitrust principles.  Even if—as FTC incorrectly argues—the 2017 Settlement operates like an exclusive license by eliminating Endo's financial incentive to compete, such a functional exclusive license would still operate within Endo's lawful patent monopoly and lie beyond antitrust scrutiny.  By contending otherwise, FTC threatens to upend common licensing and royalty arrangements by subjecting them to risky and unpredictable antitrust review.  (Impax Mem.19-25.)

FTC does not dispute that patentholders possess a lawful monopoly that includes the right to exclude competition and to grant exclusive licenses.  *See United States v. Studiengesellschaft Kohle, m.b.H.*, 670 F.2d 1122, 1127 (D.C. Cir. 1981) ("A patentee has the right to exclude others from profiting from the patented invention.  This includes the right to suppress the invention while continuing to prevent all others from using it, to license others, or to refuse to license, and to charge such royalty as the leverage of the patent monopoly permits. … A patentee may grant one exclusive license or may grant many licenses.").  Instead, FTC appears to argue that Endo's patent rights are irrelevant because Endo "waived" the right to exclude Impax when Endo initially granted Impax a patent license in the 2010 Settlement.  (Opp.17-19.)  That argument is mistaken because it overlooks that when a patentholder grants a license, it waives its ability to exclude a licensee *only for acts within the terms of the license.  See, e.g., Pfizer, Inc. v. Heckler*, 735 F.2d 1502, 1511 (D.C. Cir. 1984) ("When a patent holder licenses a patent drug, it waives its right, *subject to the terms of the license*, to invoke the patent laws to prohibit the licensee from competing.") (emphasis added); *see also Spinelli v. National Football League*, 96 F. Supp. 3d 81, 121 (S.D.N.Y. 2015) (A "copyright owner who grants an exclusive or nonexclusive license to use a work waives any right to assert an infringement claim against the licensee … *for acts within the scope of the license*.")

(emphasis added).  And here, the terms of the license granted in the 2010 Settlement were precisely what Endo and Impax were actively disputing in the litigation that culminated in the 2017 Settlement.  FTC cannot plead around that inconvenient fact by inviting this Court to ignore reality and treat the license granted in the 2010 Settlement as though it were a simple unfettered license that "waived" all Endo's patent-related rights.

As the complaint alleges, and documents integral to the complaint and judicially noticeable litigation documents affirm, Endo and Impax disputed the terms of the license granted in the 2010 Settlement.  While Impax believed that the 2010 Settlement granted it a royalty-free license to both existing and future patents covering Opana ER, Endo understood the license to entitle Endo to reasonable royalties for any future patents.  (*See* Impax Mem.5-6.)  In Endo's view, in other words, the license granted in the 2010 Settlement was not an unfettered one; it was limited by Impax's obligation to pay, and Endo's right to receive, royalties.  When the parties failed to reach a mutual understanding of the terms of the license granted in the 2010 Settlement, Endo sued Impax for both breach of contract *and patent infringement*.  (Compl. ¶86); *see Endo Pharms., Inc. v. Impax Labs., Inc.*, No. 16-cv-2526, Dkt. No. 13 (D.N.J. Aug. 1, 2016).  Invoking the rule that a patentholder waives its right to sue a licensee for infringement *only for acts within the scope of the license*, Endo stated that although "Endo had covenanted not to sue Impax" under the 2010 Settlement, "that covenant only applied for so long as Impax is in compliance with the terms of that Agreement."  *Endo Pharms., Inc. v. Impax Labs., Inc.*, No. 16-cv-2526, Dkt. No. 13 (D.N.J. Aug. 1, 2016); (*see* Impax Mem. Ex.1, §4.1(b)).  Impax, of course, disagreed that it was not in compliance with the terms of the 2010 Settlement, and Impax moved to dismiss the lawsuit—a motion that Impax lost.  (Compl. ¶¶88-89); *see Endo Pharms., Inc. v. Impax Labs., Inc.*, No. 16-cv-2526, Dkt. No. 22 (D.N.J. Aug. 29, 2016); *Endo Pharms., Inc. v. Impax Labs., Inc.*, No. 16-cv-

2526, 2016 WL 6246773, at \*4-5 (D.N.J. Oct. 25, 2016).  What matters for present purposes, however, is that the scope of Endo's "waiver" in the 2010 Settlement was unresolved and hotly disputed until the parties reached agreement on a tiered royalty arrangement in the 2017 Settlement.  FTC appears to urge the Court to ignore that reality and adopt FTC's preferred understanding of the 2010 Settlement as containing a clean "waiver" of Endo's rights.  Tellingly, FTC cites no authority for that proposal, and Impax is aware of none.

To put the problem slightly differently, if the 2010 Settlement granted Impax a license to Endo's future patents subject to a reasonable royalty (such as a ██ tiered royalty), FTC's theory would not have a leg to stand on.  That type of agreement—a patentholder licensing its product to a potential entrant in exchange for a royalty payment—is entirely appropriate under the antitrust laws.  (*See* Impax Mem.21, 24-25 (collecting authorities).)  But that is *exactly* the situation as Endo understood it and alleged in its complaint against Impax, which survived a motion to dismiss.  *See Endo Pharms., Inc. v. Impax Labs., Inc.*, No. 16-cv-2526, Dkt. No. 13, ¶¶26-36 (D.N.J. Aug. 1, 2016).  The only difference here is that Impax did not agree with Endo's interpretation of the 2010 Settlement, which led the parties to clarify its terms through the 2017 Settlement and amendments.  This thought experiment shows that FTC's "waiver" argument depends entirely on artificially splitting the initial license grant off from the later dispute and settlement of the license terms, treating the latter as though it never happened and the former as though it clearly "waived" all Endo's patent rights.  That maneuver may be convenient for FTC's antitrust theory, but it blinks the reality that the terms of the license were disputed and later clarified.

Moving on from its "waiver" argument, FTC next erects a straw man, devoting several pages to arguing that patent licenses are "not immune" from antitrust scrutiny.  (Opp.20-25.)  Of course, neither Impax nor Endo claimed blanket "immunity" for patent licenses.  Just as abuse of

a baseball bat can give rise to tort liability, *see Microsoft*, 253 F.3d at 63, so abuse of a patent license can give rise to antitrust scrutiny (*see* Impax Mem.21-22).  By the same token, however, a patent license that does *not* abuse the patentholder's lawful monopoly cannot give rise to antitrust scrutiny.  In the words of the D.C. Circuit, a patent license does not give rise to antitrust liability unless it "manipulate[s]" the patent monopoly by "threaten[ing] competition in areas *other than* those protected by the patent."  *Studiengesellschaft Kohle*, 670 F.2d at 1127 (emphasis added).

Typical examples of the kind of abuse or manipulation that might give rise to antitrust scrutiny include using monopoly power to foreclose or retrain competition in *other* markets (such as through unlawful tying arrangements), using a license to extend the life of the patent beyond its lawful term, or using a system of cross-licensing to exclude competition.  *See, e.g.*, *id.* n.9 (collecting sources); *B. Braun Medical Inc. v. Abbott Labs.*, 124 F.3d 1419, 1426 (Fed. Cir. 1997) ("Two common examples of such impermissible broadening are using a patent which enjoys market power in the relevant market, to restrain competition in an unpatented product or employing the patent beyond its 17-year term."); *MiniFrame Ltd. v. Microsoft Corp.*, No. 11-cv-7419, 2013 WL 1385704, at *4 (S.D.N.Y. Mar. 28, 2013), *aff'd*, 551 F. App'x 1 (2d Cir. 2013) ("Microsoft is free to license—or not license—these products as it sees fit within the bounds of its patents. Accordingly, without facts demonstrating that Microsoft obtained its patents illegally or exceeded the bounds of its patent rights by, for instance, tying the sale of its software to other products, no antitrust claim can lie."); *Nuvasive, Inc. v. Cadwell Indus., Inc.*, No. 12-cv-3065, 2013 WL 12096625, at *6 (S.D. Cal. Nov. 4, 2013) ("[R]estrictive or conditional patent licenses do not violate antitrust norms so long as they do not attempt to extend the scope of the patent holder's monopoly beyond that contemplated by the patent statute.") (quotation omitted); *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 604-05 (N.D. Cal. 2020) (exclusive license subject to antitrust

scrutiny where it restrained competition *beyond* patents' expiration).  Absent allegations of such abuse or manipulation, "conduct permissible under the patent laws cannot trigger any liability under the antitrust laws."  *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1206 (2d Cir. 1981).

FTC resists that conclusion, dubbing it "formalistic" and contending that it is in tension with the Supreme Court's decision in *FTC v. Actavis*, 570 U.S. 136 (2013).  (Opp.21-22.)  But FTC misapprehends the *Actavis* decision, which did nothing to disturb the general rule that a patentholder may grant a patent license (including an exclusive license) "for any royalty, or upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure."  *United States v. Gen. Elec. Co.*, 272 U.S. 476, 489 (1926). Properly understood, *Actavis* simply applies, in a different context, the principle that a patentholder transgresses antitrust law only if it abuses or manipulates its patent in a way that exceeds its patent rights.  As FTC recognizes, *Actavis* addressed not a tiered royalty license like the one at issue here, but rather a so-called reverse-payment settlement, in which the patentholder "pay[s] the alleged infringer, rather than the other way around," and the alleged infringer agrees to refrain from entering the market for a set period of time.  570 U.S. at 141.  In holding that such reverse-payment settlements may be subject to antitrust scrutiny, the Supreme Court reasoned that an "unexplained large reverse payment" "would normally suggest that the patentee has serious doubts about the patent's survival," suggesting in turn "that the payment's objective is to maintain supracompetitive prices to be shared among the patentee and the challenger rather than face what might have been a competitive market."  *Id.* at 157.

Under *Actavis*, in other words, a patentholder may not pay an alleged infringer in order to prevent a challenge to its patent and thus an examination of whether the patent is actually valid or infringed.  Buying away the potential for a finding of patent invalidity or lack of infringement,

particularly when the patentholder doubts the strength of the patent, is tantamount to abusing or manipulating a patent in a way that exceeds lawful patent rights.  *See id.* at 151, 157.  Put slightly differently, *Actavis* did not impact the longstanding rule that a patentholder "comes within the operation of the Anti-Trust Act" only when it exceeds its lawful patent rights, *Gen. Elec. Co.*, 272 U.S. at 485, nor did the Court purport to subject every action of a patentholder to antitrust rule-of-reason analysis.  Much more modestly, *Actavis* curtailed a particular kind of abusive effort by patentholders to foreclose challenges to weak or doubtful patents.  *See King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*, 791 F.3d 388, 405-06 (3d Cir. 2015).  *Actavis* is thus entirely consonant with the rule that "conduct permissible under the patent laws cannot trigger any liability under the antitrust laws."  *SCM Corp.*, 645 F.2d at 1206.

Because FTC fails to allege that the 2017 Settlement "threatens competition in areas other than those protected by the patent," *Studiengesellschaft Kohle*, 670 F.2d at 1127, that should be the end of the matter.  Although FTC offers a few other scattered arguments, none has any merit. FTC states that exclusive licenses between horizontal competitors raise the most "acute" competitive "concerns."  (Opp.23.)  Impax already discussed FTC's pleading deficiencies with respect to both horizontal competition and exclusivity.  *See supra* at 3-7.  Even setting those problems aside, the authorities FTC cites (*see* Opp.23-24) just reinforce the complaint's glaring failure to allege any facts showing anticompetitive abuse of Endo's lawful patent monopoly.  *King Drug Co.* concerned a reverse payment analyzed under *Actavis*, not an ordinary tiered royalty license, and the court confined itself to concluding that "the fact that the Patent Act expressly authorizes licensing does not necessarily mean it also authorizes reverse payments to prevent generic competition."  791 F.3d at 407; *see also id.* ("We make no statement about patent licensing more generally.").  Same with *Aggrenox*.  *See In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224,

245 (D. Conn. 2015) (agreeing that exclusive licenses are "expressly permissible" and "an exception to antitrust prohibition," but concluding they cannot be granted "in order to avoid the risk of patent invalidation").  *Palmer* invalidated a copyright licensing arrangement that carved up geographic areas between two competitors, but the competitors in *Palmer* were independently able to compete without having to license the other company's intellectual property.  That is not so here, where Impax required a license to Endo's valid patents in order to compete.  If *Palmer* had been a case in which one company had to license the other's patents in order to compete, there would have been no violation because the patent laws expressly allow allocation of territories.  *See* 35 U.S.C. §261; *Miller Insituform, Inc. v. Insituform of N. Am., Inc.*, 605 F. Supp. 1125, 1131 (M.D. Tenn. 1985), *aff'd*, 830 F.2d 606 (6th Cir. 1987).  And *Pharm. Rsch. and Mfrs. of Am. v. FTC* concerned a *Chevron*-based challenge to FTC's focus on the pharmaceutical industry and did not address FTC's authority to regulate the particular patent transfers at issue.  790 F.3d 198, 200 (D.C. Cir. 2015).

FTC's remaining arguments (Opp.25-26) fail for reasons already discussed.  FTC's assertion that Impax was a "horizontal competitor beyond the reach of Endo's patents" ignores that the terms of the license granted in the 2010 Settlement were actively disputed in the litigation leading up to the 2017 Settlement.  *See supra* at 12-14.  And FTC's attempt to compare the 2017 Settlement to an *Actavis*-style reverse-payment settlement ignores all relevant context and improperly treats the holder of a disputed license (Impax) as though it were in the same position as the holder of a patent trying to fend off potential infringers.  FTC cites no authority for that proposition, and Impax is aware of none.

In reality, FTC's novel and unprecedented antitrust theory would eviscerate patent rights and discourage settlement of licensing disputes by casting the shadow of risky and uncertain

antitrust scrutiny over commonplace tiered royalty arrangements.  (Impax Mem.23; Endo Mem.1-3.)  FTC's attempts to resist that conclusion are unpersuasive.  (Opp.26-28.)  FTC first states that the 2017 Settlement "fundamentally differs" from a "standard patent license" because "Endo lacked the right to exclude Impax." (Opp.26.)  Again, that argument just assumes FTC's preferred conclusion regarding the interpretation of the 2010 Settlement, which was heavily disputed until the 2017 Settlement.  Moreover, FTC's assertion regarding its interpretation of the contract is a bald legal conclusion not supported by any factual allegations or citation to law and thus is not sufficiently pled.

Next, FTC states that "patent licenses generally and exclusive licenses specifically are already subject to antitrust scrutiny when they are used in anticompetitive ways." (Opp.26.)  That is true only if they "threaten[] competition in areas other than those protected by the patent." *Studiengesellschaft Kohle*, 670 F.2d at 1127.  FTC's complaint does not allege that the license at issue here threatened competition in other areas, such as through an impermissible tying or cross-licensing scheme.  Instead, FTC takes the novel and unprecedented position that a patent license *simpliciter* (whether exclusive or otherwise) can always be subject to antitrust scrutiny.  FTC's "nothing to see here" attitude cannot paper over the enormous consequences of its position for ordinary patent licensing arrangements.

Finally, FTC makes the vague and puzzling claim that the 2017 Settlement "might" not raise antitrust concerns if it "simply set a royalty or conditioned that royalty on lack of entry by parties other than Endo." (Opp.28.)  For one thing, the 2017 Settlement ████████████████ ██████████████████████████████████. *See supra* at 2-8.  In any event, FTC's hazy effort to limit the scope and consequences of its theory fails.  If the "financial incentives" created by a royalty arrangement determine whether FTC thinks it should receive

antitrust scrutiny, why would the alternative arrangements FTC identifies escape scrutiny?  Or how about the near-infinite variety of other arrangements the parties could have made, such as a ███ royalty with a step-down to ████████████? FTC does not say.  Instead, FTC is essentially asking for the unfettered ability to scrutinize patent licenses that fall squarely within a patentholder's lawful rights and do not threaten competition in areas other than those protected by the patent.  Granting FTC that right would upend patent licensing.

FTC wraps up with a nebulous and unfocused argument that Defendants' position would create a "loophole" to "evade" *Actavis*.  As discussed, *see supra* at 16-17, *Actavis* curtailed the ability of a brand manufacturer with weak or doubtful patents to buy away the possibility that its patents might be found invalid or not infringed by potential generic competitors.  *Actavis* is not implicated in the 2017 Settlement, which concerned a licensing dispute over patents already held to be valid.  Moreover, nothing about this case provides a "roadmap" for future litigants to avoid *Actavis*.  FTC posits that a brand and generic "could settle their patent litigation by giving the generic a license to enter sometime before the patent expiration" and then later "modify the license" to convert it into an "exclusive license" like the one here.  (Opp.28-29.)  But that is not an end-run around *Actavis*.  That type of conduct is not prohibited by *Actavis*, which does not prohibit settlements without a reverse payment, even if they involve an exclusive license.  *Actavis*, 570 U.S. at 141.  If *Actavis* is not implicated, it is hard to see how Defendants' position could create a "loophole" to "evade" *Actavis*.  FTC's alarmist *Actavis* argument is ultimately a distraction.

## III.   THE COMPLAINT FAILS TO ALLEGE ANTICOMPETITIVE EFFECT.

FTC's complaint must also be dismissed because it fails to allege anticompetitive effect, a required element of a viable antitrust claim.  While the complaint makes various conclusory *claims* regarding anticompetitive effect, it does not allege *facts* sufficient to plausibly support those

claims.  FTC declares that the 2017 Settlement forecloses competition by destroying Endo's financial incentive to enter the market or license third parties to enter (*see* Opp.13-16), but FTC's barebones allegations, taken as true, do not back that declaration up.  And FTC fails to allege facts showing how any supposed anticompetitive effect fell outside the rights granted to Endo in its lawful patent monopoly.  On the whole, FTC's complaint implies that a settlement on slightly different terms might have led to *more* competition.  But that is not a cognizable antitrust claim.  To proceed, FTC must allege that the 2017 Settlement was *anticompetitive*, not that it could have been *more* competitive, and FTC has not done so.  (Impax Mem.8, 25-27.)

In response, FTC attempts to shore up its forced narrative that Impax paid to remove Endo as a potential competitor.  (Opp.34-35.)  FTC wants to leave the Court with the impression that Endo was on the cusp of launching a new oxymorphone ER product, when Impax came along and persuaded Endo to stay off the market and split Impax's profits.  To make that narrative work, FTC has to ignore hosts of relevant alleged and judicially noticeable facts:  The 2017 Settlement represented a compromise between the parties' litigation positions on the royalties owed under the license; Endo had been ordered off the market by FDA and faced regulatory hurdles in developing a new oxymorphone ER product; Endo continued to try to develop a new product for *nine months* after the parties executed the settlement, belying FTC's suggestion that the settlement destroyed Endo's financial incentive to compete; and Endo ultimately decided to discontinue all development of new opioid products for reasons unrelated to the settlement.  (*See* Compl. ¶¶69-79, 75-82, 88-94, 98; Impax Mem.8.)  FTC also fails to account for the fact that, absent the 2017 Settlement, Impax might have been forced off the market itself.  FTC tries to brush that problem aside as "contrary to" the complaint's allegations (Opp.18 n.10, 35 n.20), but FTC cannot deny that Endo sued Impax for patent infringement as well as breach of contract, and Endo was permitted under

the law to ask the court to enjoin Impax from continuing to participate in the market.  (*See* Compl. ¶¶86-87); 35 U.S.C. §283.  FTC's complaint fails to allege anticompetitive effect, and FTC's opposition only underscores that glaring deficiency, which is an independent ground for dismissal.

## **CONCLUSION**

For the foregoing reasons, Impax respectfully requests that the Court dismiss FTC's complaint with prejudice.[7]

---

[7]    FTC agrees that its request for disgorgement should be dismissed.  (*See* Opp.35-36.)

Dated: July 2, 2021

Respectfully submitted,

/s/ *Devora W. Allon*

Devora W. Allon, P.C. (admitted *pro hac vice*)
Jay P. Lefkowitz, P.C.
Evelyn Blacklock (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Tel.: (212) 446-4800
devora.allon@kirkland.com
lefkowitz@kirkland.com
evelyn.blacklock@kirkland.com

James R.P. Hileman (admitted *pro hac vice*)
Matthew LaGrone (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
300 North LaSalle Street
Chicago, IL 60654
Tel.: (312) 862-2000
jhileman@kirkland.com
matthew.lagrone@kirkland.com

*Attorneys for Defendants Impax Laboratories, LLC and Amneal Pharmaceuticals, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 2nd day of July 2021, the foregoing was electronically transmitted to the Clerk of Court using the CM/ECF system, which will transmit notification of such filing to all registered participants.

*/s/ Devora W. Allon*